# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01016-COA

**ALEX JEREMIAH HOLDER A/K/A ALEX HOLDER**              **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/22/2021 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ZAKIA HELEN ANNYCE BUTLER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/04/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.     A Forrest County Circuit Court jury convicted Alex Holder of burglary of a dwelling (Count I) and felon in possession of a firearm (Count II). Following the jury's verdict, the Forrest County Circuit Court sentenced Holder to twenty-five years for Count I and ten years for Count II, with both sentences ordered to be served concurrently in the custody of the Mississippi Department of Corrections (MDOC). Holder filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Both were denied. On appeal, Holder argues the State presented insufficient evidence to support his conviction for burglary

of a dwelling.

## FACTS AND PROCEDURAL HISTORY

¶2.     On April 19, 2020, Adrian Hinton called the Forrest County Sheriff's Office to report an alleged burglary at 48 Brantley Drive in Rawls Springs, a small community north of Hattiesburg, Mississippi, where Hinton resided with his girlfriend Adriana Thigpen, who is Alex Holder's cousin. A deputy with the sheriff's office was dispatched to Hinton's residence and took Hinton's statement. Hinton reported to the deputy that both he and Thigpen had left the residence that morning, and when he returned, he found his side door open and a shotgun missing. The deputy filed the report and informed Hinton that an investigator with the sheriff's office would follow up.

¶3.     The next day, on April 20, 2020, Investigator Keith Leroy contacted Hinton by phone. Hinton explained that on the day of the burglary, Holder had called multiple times from an unknown number saying that he was in Rawls Springs and wanted to come by Hinton and Thigpen's residence. Hinton told Holder no and that he was not allowed at their residence. But after receiving Holder's calls, Hinton rushed back to the residence because he believed Holder was already there despite being told he was not allowed. Hinton then arrived home and discovered the open door and missing gun. He provided Investigator Leroy with the contact information for the phone Holder had used to make the calls to Hinton. Investigator Leroy then called the number for the phone Holder had used, and a person named Charlotte Hill answered.

2

¶4.     Charlotte Hill gave a statement to Investigator Leroy regarding her connection to Holder and allowing him to use her phone on the day of the burglary. At trial, Hill testified that on April 19, 2020, she had provided transportation to Holder. She gave Holder a ride to Rawls Springs with the understanding that she would be dropping off Holder at his cousin's house. When Hill stopped to drop off Holder at a house in Rawls Springs, Holder told Hill to wait a minute. Holder said he had to see if his cousin was home and used Hill's phone to make a call. He proceeded to get out of Hill's car, walk toward the house near where they stopped, and then get back in Hill's car with a gun; then Holder told Hill he wanted to be dropped off somewhere else. Hill drove off, and while stopped at a stop sign along their subsequent route, Holder threw the gun he had obtained and his suitcase into the woods. Hill ultimately dropped off Holder at a truck stop. At trial, Hill identified Holder as the person to whom she gave a ride to the house in Rawls Springs on the day in question who then returned to her vehicle with a long gun.

¶5.     Investigator Leroy testified that after speaking with Hinton and Hill, he identified Holder as the suspect of the investigation for the burglary of Hinton's residence. Investigator Leroy and another investigator went to the location Hill said she saw Holder dispose of the gun and tried to find it. However, the investigators were never able to find the gun Holder disposed of in the woods.

¶6.     Holder was indicted for one count of burglary of a dwelling and one count of felon in possession of a firearm. At trial, after the State's case-in-chief that included testimony

3

from Hinton, Hill, Thigpen, and Investigator Leroy, Holder moved for a directed verdict, arguing that the State failed to prove all the elements required for burglary of a dwelling. The trial court denied his motion, and after deliberating, the jury convicted Holder of both burglary of a dwelling and felon in possession of a firearm. Holder was sentenced to twenty-five years for burglary of a dwelling and ten years for felon in possession of a firearm, with both sentences ordered to be served concurrently in MDOC's custody. Thereafter, Holder filed an unsuccessful motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Aggrieved, he appeals, arguing the evidence was insufficient to prove he was guilty of burglary of a dwelling.

## STANDARD OF REVIEW

¶7. "Motions for directed verdict and judgment notwithstanding the verdict . . . challenge the legal sufficiency of the evidence[.]" *Jerninghan v. State*, 910 So. 2d 748, 751 (¶6) (Miss. Ct. App. 2005). "This Court reviews a sufficiency-of-the-evidence challenge de novo." *Rainey v. State*, 334 So. 3d 1124, 1128 (¶6) (Miss. 2022). "[T]he conviction must be affirmed if there was sufficient evidence for any rational trier of fact to have rendered a guilty verdict." *Briggs v. State*, 337 So. 3d 716, 720 (¶19) (Miss. Ct. App. 2022). In evaluating the sufficiency of the evidence, "[t]he issue on appeal is not whether the reviewing court would have found the defendant guilty[.]" *Id*. "The jury is the sole fact-finder in this case, and we do not sit as a new jury and reevaluate the evidence[;] . . . "[i]f the jury is convinced beyond a reasonable doubt, we can require no more." *Rainey*, 334 So. 3d at 1132-33 (¶¶30, 32).

4

**DISCUSSION**

¶8. For a claim of insufficient evidence, "this Court must determine whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Shelvy v. State*, 293 So. 3d 823, 826 (¶4) (Miss. 2020) (quoting *Naylor v. State*, 248 So. 3d 793, 796 (Miss. 2018)). "[T]he law makes no distinction between direct and circumstantial evidence but simply requires that, before convicting a defendant, the jury be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case." *Rainey*, 334 So. 3d at 1133 (¶32) (quoting *Nevels v. State*, 325 So. 3d 627, 634 (¶20) (Miss. 2021)).

¶9. Mississippi Code Annotated section 97-17-23(1) (Rev. 2014) defines burglary of a dwelling as

> breaking and entering the dwelling house or inner door of such dwelling house of another, whether armed with a deadly weapon or not, and whether there shall be at the time some human being in such dwelling house or not, with intent to commit some crime therein[.]

The charge of "[b]urglary has only two required elements—the '(1) breaking and entering the dwelling house or inner door of such dwelling house of another[, and] (2) with the intent to commit some crime therein.'" *Bowman v. State*, 283 So. 3d 154, 162 (¶25) (Miss. 2019) (quoting *Windless v. State*, 185 So. 3d 956, 960-61 (¶10) (Miss. 2015)).

**I.      Evidence of Holder's Presence at the Dwelling Allegedly Burglarized**

¶10. Holder first argues that the State's evidence was insufficient to establish that he was

5

present at Hinton's residence when the alleged burglary occurred.[1] Holder claims that the only evidence placing him at Hinton's residence was Hill's testimony but that Hill's testimony did not confirm that the location she drove Holder to that day was in fact Hinton's residence. According to Holder, the State's evidence only showed that Holder passed through the community of Rawls Springs, and his mere presence in Rawls Springs was insufficient to prove beyond a reasonable doubt that he had stopped at Hinton's residence.

¶11.    However, Hill testified that on April 19, 2020, she had "offered to give [Holder] a ride home" and was "supposed to drop him off at his cousin['s] house in Rawls Springs." She indicated that "when [she] stopped at what [she] thought was his cousin's house in Rawls Springs," Holder "said hold on a minute go[t] to see if his cousin was in the house." Hill testified that Holder "made a call on [her] phone to his cousin" and "got out of the car." According to Hill, Holder went "into a house," "came back out with a gun," and "then came back in the truck." She stated that "once [Holder] was in the vehicle" again, she "drove off because he said he was going to [get] drop[ped] off somewhere else." Then, "at some point

---

[1] Holder seems to argue that the State did not prove "ownership" of the dwelling at issue. But Holder's "proof of ownership" argument is misplaced because Holder's contention relates to the "ownership" of the place where Hill stopped, not the ownership of the location of the alleged burglary. For a burglary charge, "it is necessary to allege the *ownership of the premises allegedly burglarized* or the name of the person entitled to possession thereof and to prove same as laid." *In re Jenkins*, 274 So. 2d 143, 144-45 (Miss. 1973) (emphasis added). The indictment explicitly states the charge was for the alleged burglary of "the dwelling house of Adrian Hinton, located at 48 Brantley Drive, Hattiesburg, Mississippi[.]" Hinton testified on direct examination and cross-examination that he lived in a residence at 48 Brantley Drive and that his residence was where the alleged burglary occurred.

in time afterwards," she was "contacted by Forrest County" investigators about the events from that day.

¶12. Hinton testified that he lives with Holder's cousin, Thigpen, in Rawls Springs at 48 Brantley Drive. Hinton stated that on April 19, 2020, he received a call from Holder, who "said he was out in Rawls Springs" and "was coming out there to holler at us for the day." Hinton indicated he told Holder no, but "based on [his] conversation with Mr. Holder," it was his understanding that Holder "might have been there already and was telling [Hinton] that he was coming." According to Hinton, Holder was not allowed to be at Hinton and Thigpen's residence, "so when he called, [Hinton] tried to rush around to the house." Hinton said that when he got back to the residence, he saw his side door "popped open." Hinton went in and "walked through the house and when [he] went to the back, he saw that [his] shotgun was missing." Hinton proceeded to file a police report and spoke to an investigator with the Forrest County Sheriff's Office the next day.

¶13. Investigator Keith Leroy testified that he reached out to Hinton on April 20, 2020, to discuss the alleged burglary at Hinton's residence the previous day. Investigator Leroy said that Hinton provided details about the calls he received from Holder on April 19, 2020, as well as information regarding the source of those incoming phone calls. Investigator Leroy then called the phone number associated with Holder's calls to Hinton and was connected to Charlotte Hill. Investigator Leroy explained that his conversation with Hill linked Holder to the scene of Hinton's residence. Based on Hinton's and Hill's statements to Investigator

7

Leroy, Holder became the suspect in the alleged burglary.

¶14. "[A]ll evidence supporting a guilty verdict is accepted as true," *McClain v. State*, 625 So. 2d 774, 778 (Miss.1993), and precedent requires that this Court "disregards evidence favorable to the defendant" when being asked to overturn a jury verdict based on an allegation of insufficient evidence. *Rainey*, 334 So. 3d at 1128 (¶6) (internal quotation marks omitted). Additionally, "the prosecution must be given the benefit of all reasonable inferences that can be reasonably drawn from the evidence." *McClain*, 625 So. 2d at 778. Our supreme court has explained, "Facts not directly proved but which jurors legitimately may infer from other facts which have been proved, are limited to such as naturally follow as being logically connected or related, and which reasonably derive from such established facts." *Hester v. State*, 463 So. 2d 1087, 1093 (Miss. 1985).

¶15. "The jury not only has the right and duty to determine the truth or falsity of the witnesses, but also has the right to evaluate and determine what portions of the testimony of any witness it will accept or reject." *Rainey*, 334 So. 3d at 1132 (¶28). We "must refrain from 'actively evaluating the sufficiency, weight and credibility of the evidence anew—even going so far as to discredit any reliance by the jury on'" the testimony of Hill or Hinton. *Id.* (quoting *Lenoir v. State*, 222 So. 3d 273, 279 (¶26) (Miss. 2017)).

¶16. In a prior appeal claiming insufficient evidence to support the conviction, this Court focused on similar witness testimony to that before us today and held that "the jury had the benefit of two witnesses having no apparent connection" before affirming the conviction.

8

*Woods v. State*, 883 So. 2d 583, 589 (¶17) (Miss. Ct. App. 2004). In the present case, the testimony of Hinton and Hill, with no apparent connection, both confirm Holder's actions on the day of the burglary. Viewing the evidence in the light most favorable to the State, we find that the record contains sufficient evidence for a rational juror to conclude that the State proved Holder's identification beyond a reasonable doubt as the perpetrator of the burglary of Hinton's residence.

## II. Evidence of Holder Breaking and Entering Hinton's Residence

¶17. Second, Holder argues there is insufficient evidence to show that any breaking and entering occurred at Hinton's residence. Holder asserts the evidence shows that there was no damage or disfigurement to the side door and that the door was intact. Holder also claims there is insufficient evidence proving that he specifically committed an unlawful breaking and entering at Hinton's residence. He alleged that no physical evidence placed him inside or outside Hinton's residence, and no evidence matched the gun that was in Holder's possession to the gun missing from Hinton's residence.

### A. Elements Showing a Breaking and Entering Occurred

¶18. Holder's initial argument is based on his contention that there were no signs of forced entry. He theorizes instead that the open door Hinton discovered could have been a result of an occupant failing to fully close and secure the door before leaving.

¶19. "To support a burglary conviction, the State was required to prove that [Holder] broke and entered" Hinton's residence. *Genry v. State*, 767 So. 2d 302, 309 (¶21) (Miss. Ct. App.

9

2000). Mississippi caselaw holds:

> The "breaking" element of burglary "is conducted by an act of force, regardless of how slight, necessary to be used in entering a building, such as turning a knob, a slight push to further open a door, or raising a latch." Even if a door "was unlocked or if only slight force was needed to gain entry, such entry has been viewed as forcible for the purposes of our burglary statute."

*Benthall v. State*, 311 So. 3d 697, 703 (¶21) (Miss. Ct. App. 2021) (citations omitted). In other words, "'any effort' expended to enter another's property to commit a crime constitutes a breaking[.]" *Goldman v. State*, 741 So. 2d 949, 951 (¶5) (Miss. Ct. App. 1999) (citing *Alford v. State*, 656 So. 2d 1186, 1189-90 (Miss. 1995)). "The slightest physical entry into the previously secure enclosure is sufficient to satisfy the 'entering' component of a burglary." *Ramer v. State*, 156 So. 3d 919, 923 (¶12) (Miss. Ct. App. 2014).

¶20.    A "structure must generally be closed" for the entry of an unauthorized person to be a "breaking" and "constitute burglary" instead of "merely a trespass." *McLain v. State*, 317 So. 3d 33, 35-36 (¶9) (Miss. Ct. App. 2021). "[S]ufficient [evidence] to prove the 'breaking' element" has been found where the victim "testified that he usually kept the door to his home closed." *Id*. at 36 (¶14). Similarly, in *Harris v. State*, 68 So. 3d 754, 757 (¶12) (Miss. Ct. App. 2011), the victim's testimony that he and his wife "always kept the storage-room door shut[,]" though "it may or may not be locked" all the time, was sufficient evidence that the door was closed to prove a "breaking" occurred.[2]

---

[2] *Cf. Goldman*, 741 So. 2d at 952 (¶9) (This Court found insufficient evidence of a "breaking" where "[t]he owner merely said that it was the usual practice to close the window before leaving at night" but "testified that he did not know whether the window through

¶21. Here, both Hinton and Thigpen indicated Thigpen was the last person to leave the residence on April 19, 2020. Thigpen testified she "left [out] the side door" and "locked it and shook it." She stated she was certain she closed the door "because I make sure like before I leave out, I'll make sure that the door is locked and I'll shake it."

¶22. Hinton testified that he was the first to arrive back at the residence, and "when [he] came home [his] door was open." He stated that the door was cracked open enough "[r]eally just [to] peep one eye through it," (between three to six inches wide). Hinton stated that he normally locks the doors and knew that the bottom lock on the side door was locked on the morning in question. He testified he was "confident" that the side door was closed and "locked because we always lock the door before we leave the house."

¶23. "[T]he jury was entitled to believe [Thigpen's and Hinton's] testimony that [their side door] had been locked until the alleged burglary." *Naylor*, 248 So. 3d at 796 (¶11). Accepting all evidence supporting the guilty verdict as true, and giving the State the benefit of all reasonable inferences that can be drawn from the evidence, we conclude that the record contains sufficient evidence for the jury to find a breaking and entering occurred at Hinton's residence.

---

which [defendant] entered was closed" at the time in question. "In other words, there is no testimony that it was necessary to raise the window to effect the entrance into the building."); *Ladd v. State*, 87 So. 3d 1108, 1114-15 (¶¶18, 22) (Miss. Ct. App. 2012) ("[W]e conclude that the mere act of walking through a raised, open garage door does not constitute an 'act or force, however slight, employed to effect an entrance' and is not a 'breaking.' The victim 'testified she left the garage door up[,]' and there was 'nothing in the record to indicate that [defendant] used any act of force in entering [victim's] garage.'").

11

### B.    Evidence that Holder Committed the Breaking and Entering

¶24.    Holder argues that Hill did not see him break into or enter any structure and that there was no physical evidence placing him inside or outside Hinton's residence. Holder also claims that the gun Hill saw could have come from anywhere outside the general vicinity of where they stopped and that it was never confirmed to be Hinton's gun.

¶25.    At trial, Hill testified that Holder got out of the car and walked toward the residence at the location where they stopped. Based on her personal observations, Hill indicated she believed Holder opened a door, walked in, and came back out.[3] She stated that when Holder came back out of the house, he was carrying a long, dark-colored gun and proceeded to get back in her car with the gun. Hill testified that Holder told her he wanted to be dropped off somewhere else, so she drove off. But she ended up dropping him off at a truck stop because she did not want him in the car anymore after he got back in carrying a gun. Hill also said that Holder threw the gun "in the woods along with his suitcase" while they were at a stop sign along the route and that he was no longer in possession of the gun when he was dropped off at the truck stop.

¶26.    Hinton testified that he owned an all-black, long gun that he kept in his bedroom at the back of the residence. He stated that the gun was always lying across a recliner by the side of his bed and was not hidden.

---

[3] Though Hill did acknowledge in her testimony that Holder walked out of sight, and she did not specifically see him walk through the door into the residence.

¶27. Thigpen testified that Hinton owned a black gun that he kept in a room at the back of the residence. She stated that on the morning in question, she went in the back room before she left and saw the gun was there. But when Thigpen returned and walked through the residence, she noticed the gun was no longer there.

¶28. Investigator Leroy testified that he and another investigator went to search the area of the woods where Hill said Holder had thrown the gun he had been carrying. However, the investigators were not able to find the gun Holder had allegedly possessed. Investigator Leroy also stated that Hinton's missing gun had never been recovered.

¶29. "[T]he absence of physical evidence does not negate a conviction where there is testimonial evidence[,]" *Body v. State*, 318 So. 3d 1104, 1110 (¶21) (Miss. 2021), and "[t]he testimony of a single uncorroborated witness is sufficient to sustain a conviction[.]" *Brown v. State*, 825 So. 2d 70, 76 (¶18) (Miss. Ct. App. 2002); *see also Woods*, 883 So. 2d at 589 (¶17) ("[T]he fact that no demonstrative evidence directly linking [defendant] to the incident was presented does not, of itself, suggest that the testimony of these two witnesses was insufficient to support a conviction.").

¶30. Our supreme court has recognized:

> Jurors . . . may believe or disbelieve, accept or reject, the utterances of any witness. . . . [T]he manner in which jurors resolve . . . findings of fact . . . results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict.

*Shelvy*, 293 So. 3d at 829 (¶27). Moreover, "[t]he jury is permitted to draw 'any reasonable

inferences from all the evidence presented in the case.'" *Blythe v. State*, 141 So. 3d 407, 414 (¶20) (Miss. Ct. App. 2013). "[T]he inference of participation in the crime . . . is to be judged . . . on the strength of that inference in the light of the facts of each particular case." *Shelvy*, 293 So. 3d at 827-28 (¶15). "A 'jury is free to consider a defendant's acts coupled with the surrounding facts and circumstances.'" *Rainey*, 334 So. 3d at 1133 (¶32) (quoting *Thomas v. State*, 277 So. 3d 532, 535 (¶14) (Miss. 2019)).

¶31.    Accepting all evidence supporting the guilty verdict as true and giving the State the benefit of all reasonable inferences that can be drawn from the evidence, we conclude that the record contains sufficient evidence for a jury to find that Holder committed a breaking and entering of Hinton's residence.

**CONCLUSION**

¶32.    Viewing the evidence in the light most favorable to the State, the record includes sufficient evidence for a rational juror to find that the State proved all elements of burglary of a dwelling beyond a reasonable doubt. We therefore affirm Holder's conviction and sentence for burglary of a dwelling.

¶33.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**